[Crim. No. 18693. In Bank. Feb. 24, 1976.]

THE PEOPLE, Plaintiff and Respondent, v.
STEVEN VANCE SCOTT, Defendant and Appellant.

244

**COUNSEL**

Judd Riley Scott for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Edward P. O'Brien, Assistant Attorney General, Derald E. Granberg, Clifford K. Thompson, Jr., and Ann K. Jensen, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**MOSK, J.**—The issue on this appeal is whether a police officer who proposes to give a private citizen a lift in his patrol car can lawfully subject him to a nonconsensual pat-down search for weapons when the

individual is not under arrest and the officer has no duty to transport him and no reason to believe he is armed and dangerous. As will appear, we conclude that a search in such circumstances is an unreasonable invasion of the right of privacy.

Defendant, charged with violating former Health and Safety Code sections 11910 (possession of LSD) and 11530 (possession of marijuana), moved to suppress the evidence on the ground of illegal search and seizure. (Pen. Code, § 1538.5). The trial court granted the motion, ruling that the challenged pat-down search was unlawful and the contraband discovered thereby inadmissible. The People sought review by statutory writ of mandate. (Pen. Code, § 1538.5, subd. (o).) In *People* v. *Superior Court (Scott)* (1973) 1 Civ. 33834 (hereinafter *Scott I*), the Court of Appeal vacated the suppression order, holding that a pretransportation weapons search is permissible even when there has been no arrest. We denied a hearing, but directed the Reporter of Decisions not to publish the opinion in the official reports.

On remand defendant unsuccessfully renewed his motion to suppress. He then entered a plea of guilty to the charge of possessing LSD, and appealed. (Pen. Code, § 1538.5, subd. (m).) The judgment was affirmed by a different division of the Court of Appeal (hereinafter *Scott II*), and we granted a hearing.

In the early morning hours of December 31, 1972, California Highway Patrol Officers Schultz and Ellis observed defendant and his three-year-old son standing on the traffic island formed by the Marin City off-ramp of Highway 101. The officers stopped to investigate. Officer Schultz believed that both defendant and his son were urinating. Defendant walked toward the officers, saying, "Oh, hell, we are going to be busted," and his son began to cry. Defendant appeared to be intoxicated, and could furnish no identification. He explained he was returning his son to his ex-wife in San Francisco when they were ordered out of the car in which a friend had been giving them a ride.

The officers did not arrest defendant. Instead, they volunteered to drive the pair to their destination in San Francisco. The boy was placed in the patrol car, but before defendant could enter the vehicle Officer Schultz informed him that "for our own protection" it was necessary to pat him down for weapons. The officer told defendant to raise his arms; defendant complied, neither objecting nor consenting to the search. As he lifted his arms the right pocket of his peacoat partially opened,

revealing a clear plastic baggie containing green matter which appeared to the officer to be marijuana. The officer squeezed the outside of the baggie, and its contents felt pliant and crunchy. He then placed defendant under arrest for possession of marijuana. Lastly he looked inside a brown paper bag on defendant's nearby suitcase, and found two cans of beer and a tobacco tin containing white tablets later identified as LSD.

These facts, hardly momentous, do not warrant creating a new rule or an exception to well-accepted rules of constitutional construction, as we shall conclude, nor do they justify elevation to the cause celebre perceived by the dissent.

## I

The People contend the procedural history of the case precludes our inquiry into the legality of the pat-down search. It is argued that because this issue was previously decided by the Court of Appeal in *Scott I,* the doctrine of law of the case bars us from readdressing the matter. In the circumstances shown, however, the rule is inoperative.

In *People* v. *Shuey* (1975) 13 Cal.3d 835, 840-848 [120 Cal.Rptr. 83, 533 P.2d 211], we reviewed the doctrine of law of the case and the criteria necessary for its application. In essence the doctrine provides that when an appellate court has rendered a decision and states in its opinion a rule of law necessary to the decision, that rule is to be followed in all subsequent proceedings in the same action.[1]   The People emphasize that in *Scott I* the pat-down search of defendant was held to be lawful, the determination was necessary to the decision, and the decision was by written opinion.

However, as we also reiterated in *Shuey,* courts should keep in mind that "the doctrine of the law of the case, which is merely a rule of procedure and does not go to the power of the court, has been recognized as being harsh, and it will not be adhered to where its application will result in an unjust decision." (*Id.,* at p. 845, quoting *People* v. *Medina* (1972) *supra,* 6 Cal.3d 484, 492; see also *People* v. *Durbin* (1966) 64 Cal.2d 474, 477 [50 Cal.Rptr. 657, 413 P.2d 433]; *United Dredging Co.* v.

---

[1]By contrast, in *People* v. *Medina* (1972) 6 Cal.3d 484, 491-492 [99 Cal.Rptr. 630, 492 P.2d 686], we held that when the defendant's application for writ of mandate after an unsuccessful motion to suppress was summarily denied *without* opinion by the Court of Appeal, the defendant was not precluded from later raising the same issue on a direct appeal from the conviction.

*Industrial Acc. Com.* (1930) 208 Cal. 705, 712 [284 P.2d 922].) In order to preserve the utility of the doctrine while maintaining its flexibility when the interests of justice so demand, we articulated a general guideline in *Shuey* (at p. 846 of 13 Cal.3d): "judicial order demands there must at least be demonstrated a manifest misapplication of existing principles resulting in substantial injustice before an appellate court is free to disregard the legal determination made in a prior appellate proceeding."

Such a showing is made in the case at bar. In ruling that the pat-down of defendant was justified as a pretransportation search even though he was not under arrest, the court in *Scott I* relied primarily on the concurring opinion in *People v. Superior Court (Simon)* (1972) 7 Cal.3d 186, 211 [101 Cal.Rptr. 837, 496 P.2d 1205]. As we shall demonstrate (Part II, *infra*), that holding was a manifest misapplication of the *Simon* opinion: the search is not justifiable on the stated ground. Moreover, in *People v. Brisendine* (1975) 13 Cal.3d 528, 537 [119 Cal.Rptr. 315, 531 P.2d 1099], decided in the interval between *Scott I* and *Scott II,* this court adopted the position taken in the concurring opinion in *Simon;* the intervening decision in *Brisendine* must thus be considered an additional factor in assessing the applicability of the doctrine of the law of the case. (See *Ryan v. Mike-Ron Corp.* (1968) 259 Cal.App.2d 91, 98-99 [66 Cal.Rptr. 224].)

In its original determination the trial court found that but for the pat-down no contraband would have been discovered. Similarly, but for the misapplication of *Simon* the arrest predicated on the unlawful pat-down and the search incident to that arrest would have come within the purview of the exclusionary rule and the evidence obtained thereby would have been inadmissible. (*People v. Cahan* (1955) 44 Cal.2d 434 [282 P.2d 905, 50 A.L.R.2d 513].) As the illegally seized material was the only evidence against defendant, the misapplication of the law resulted in the guilty plea and a conviction which otherwise would not have occurred. Under these circumstances defendant's conviction is an example of the "substantial injustice" described in *Shuey,* mandating a departure from the constraints of the doctrine of the law of the case.

II

We proceed to the substantive issue of the legality of the pat-down search. The People contend that the fact of proposed transportation in a police vehicle is a special circumstance which per se justifies a pat-down search any time an individual is to be so transported. Both the

People and the Court of Appeal in *Scott I* have relied on the concurring opinion in *Simon* to justify this position. The reliance is misplaced.

In *Simon* the defendant was *arrested* for a traffic violation, and the officer was *required by law* to transport him before a magistrate because he was unable to present evidence of his identity. (Veh. Code, § 40302, subd. (a).) Prior to placing the defendant in his patrol car, however, the officer conducted a full body search and found a soft plastic bag containing a few grams of marijuana inside the defendant's pants pocket. We refused to set aside an order suppressing that evidence, holding that a full body search is unreasonable in ordinary traffic violation cases. (7 Cal.3d at pp. 192-211.) The Chief Justice concurred, but stated that he would have approved a limited pat-down search of the defendant for weapons because of the danger to police inherent in the process of transporting traffic arrestees. (*Id.,* at pp. 212-215.)[2]

The *Simon* concurrence emphasized that different standards are applicable in arrest and nonarrest situations: "In *Terry* v. *Ohio* [1968] 392 U.S. 1 [20 L.Ed.2d 889, 88 S.Ct. 1868], the court held that before a pat-down search in *nonarrest* circumstances can be made, the officer must have reason to believe he may be dealing with an armed and dangerous individual. On the other hand, in the case of a search incident to a lawful nontraffic *arrest* a full body search can be made of the arrestee and a search of the immediate area under his control . . . . [Citation.]" (Second italics added.) (7 Cal.3d at pp. 212-213.) The opinion found that the circumstances of *Simon*—i.e., involving both the arrest and obligatory transportation of a traffic violator—did not fit into the *Terry* category: "The custody of a person who is to be transported to a magistrate is different from the 'custody' of the *Terry* 'stop and frisk' situation, and is indeed similar to the custody of someone who is searched incident to an arrest on a criminal charge before being transported to a detention facility. It is clear that the balance between the factors involved—the safety of the police officer required by law to transport the individual detained and the relatively minor intrusion on privacy of a pat-down search—weighs in favor of permitting pat-down searches in such circumstances." (*Id.,* at p. 213.)

---

[2]In *Brisendine,* in which we elevated the latter analysis to a holding, the defendants were likewise under arrest and the police were under a duty to "transport" them through a wilderness area to the patrol car, while remaining in close proximity throughout. (13 Cal.3d at pp. 536-537.) Succeeding decisions recognizing the rule also involved arrests and a legal basis for transportation. (*People* v. *Norman* (1975) 14 Cal.3d 929, 935-936, 939 [123 Cal.Rptr. 109, 538 P.2d 237]; *People* v. *Longwill* (1975) 14 Cal.3d 943, 949-950 [123 Cal.Rptr. 297, 538 P.2d 753].)

The opinion explained that the intrusion would be relatively minor because (1) the defendant's person had been "seized"—i.e., he had been arrested—and thus his privacy had already been invaded to a significant degree, and (2) the police were required by law to give him a "forced ride to the magistrate (generally in handcuffs)." (*Id.,* at p. 214, fn. 3.) It is in this context that the opinion concluded, "The critical factor in these or similar situations is not the greater likelihood that a person taken into custody is armed, but rather the increased likelihood of danger to the officer *if* in fact the person is armed." (Italics in original.) (*Id.,* at p. 214.)

In the case at bar, by contrast, the trial court found that defendant was not under arrest at the time of the pat-down search; the offer to give him and his son a ride to San Francisco was a voluntary act; the officer had no reason to believe he was dealing with an armed and dangerous individual; and any consent given was in submission to authority. In the absence of a warrant, an arrest, or a consent to search, a heavy burden to show proper justification rested with the prosecution. (Cf. *Badillo* v. *Superior Court* (1956) 46 Cal.2d 269, 272 [294 P.2d 23].)

Because the defendant was not under arrest when the pat-down search took place, the fact that the officers arguably could have arrested him does not elevate the situation to the equivalent of one in which an arrest actually occurred. In order to justify the search in these circumstances Officer Schultz must have been able to meet the requirements delineated first in *Terry* and later by this court (see, e.g., *People* v. *Lawler* (1973) 9 Cal.3d 156, 161 [107 Cal.Rptr. 13, 507 P.2d 621]; *People* v. *Superior Court (Kiefer)* (1970) 3 Cal.3d 807, 829 [91 Cal.Rptr. 729, 478 P.2d 449, 45 A.L.R.3d 559]), i.e., he must have had "reason to believe that he [was] dealing with an armed and dangerous individual, regardless of whether he [had] probable cause to arrest the individual for a crime." (*Terry,* at p. 27 of 392 U.S. [p. 909 of 20 L.Ed.2d].) But at no time has it been claimed Officer Schultz did in fact fear that defendant was "armed and dangerous." Indeed, as the trial court found, nothing in the evidence could have led the officers to so believe. Short of such an articulable belief, according to the Supreme Court in *Terry,* the pat-down for weapons was an impermissible intrusion.

We are not oblivious to the dilemma faced by the conscientious officers under the circumstances of this case. The lateness of the hour, the dangers inherent to pedestrians on a freeway, the presence of a young child, the condition of the defendant, combined to suggest some remedial action was necessary. The officers could have found cause to

place defendant under arrest and to take him into custody. A search before transporting the arrestee in the police vehicle would then have been proper. Instead they exercised discretion, perhaps compassion, to avoid arrest. Yet to justify a search in this deliberately chosen nonarrest situation would compel us to carve out a totally new exception to the universally accepted rule that only a lawful arrest establishes the authority to search incident thereto. Because of the potential ramifications of such an unprecedented exception we are reluctant to adopt it, despite our sympathetic understanding of the conduct of the police officers here.

The dilemma, however, is not insoluble. We are required to accommodate the state's interest in the safety of police officers who volunteer to give rides not required by their duty, and the individual's right to be secure from unreasonable invasions of his privacy. In our view the simple expedient of a warning and option will at once preserve both laudable objectives.[3] Accordingly, in order for a pat-down search to be valid under these or similar circumstances the officer must first inform the individual that he has a right to refuse the ride but if he accepts it he will be subjected to a pat-down search for weapons. Such a brief admonition will protect both the officer's safety and the individual's right to decide for himself whether he is willing to undergo a pat-down search in order to obtain the offered assistance of the police. No adverse inference may be drawn, of course, if he chooses to preserve his personal privacy.

Because defendant herein was not presented with any such option and according to the finding of the trial court did not consent to the search, we conclude the pat-down was an unreasonable invasion of defendant's privacy in violation of article I, section 13, of the California Constitution and the Fourth Amendment to the United States Constitution. As the ultimate seizure of the contraband was inextricably bound up with this search, the contraband was inadmissible in evidence.[4] Because defen-

---

[3] The dissent declares "the responsible options" of the police were either to gratuitously transport defendant and his son, or arrest defendant. (*Post*, pp. 256-257.) Since a volunteered, noncompulsory *offer* of a ride contemplates a willing and informed *acceptance* by the offeree, no basic conflict emerges at this point between the dissent and our proposed accommodation of principles.

[4] The dissent reaches its conclusion that the exclusionary rule is "inapplicable" by a rationale that overlooks historical realities. *People* v. *Cahan* (1955) 44 Cal.2d 434 [282 P.2d 905, 50 A.L.R.2d 513], invoked the exclusionary rule in California six years *before* the United States Supreme Court applied the doctrine to the states, in *Mapp* v. *Ohio* (1961) 367 U.S. 643 [6 L.Ed.2d 1081, 81 S.Ct. 1684, 84 A.L.R.2d 933]. The several hundred references to *Cahan* listed in Shepard's California Citations is an eloquent

dant's plea of guilty followed the erroneous determination to the contrary by the Court of Appeal, the judgment must be reversed. (See *People* v. *Hill* (1974) 12 Cal.3d 731, 767-770 [117 Cal.Rptr. 393, 528 P.2d 1].)

The judgment is reversed.

Wright, C. J., Tobriner, J., and Sullivan, J., concurred.

**RICHARDSON, J.**—I respectfully dissent.

A brief recitation of significant portions of the factual background may be useful for a proper understanding of the search and seizure issue herein presented. At approximately 10:30 p.m. on December 31, 1972, after an altercation with his wife, defendant and his three-year-old son left St. Helena for San Francisco in a pickup truck driven by a Mr. Stark. The purpose of the trip was to return the small child to his mother, the former wife of defendant, who lived in San Francisco at an address unknown to defendant but believed by him to be on California Street in the vicinity of Clay and Fillmore Streets. Defendant carried with him a suitcase and a paper bag containing a six-pack of beer. Enroute to San Francisco, defendant and Stark each consumed two cans of beer. During the latter part of the journey defendant and Stark engaged in a dispute with the result that Stark told defendant to get out of the truck, and defendant and his son thereupon left the vehicle.

Defendant was unfamiliar with his surroundings but believed that he was in San Rafael. In fact he was on U. S. 101 Freeway at the Marin City

---

testimonial to the fact that our California rule rests firmly upon that case and independent state grounds, rather than on deference to federal authority.

The failure of the dissent to consider the importance of the individual right of privacy is best illustrated by its criticism of *Mozzetti* v. *Superior Court* (1971) 4 Cal.3d 699 [94 Cal.Rptr. 412, 484 P.2d 84]. In its review of *Mozzetti* the dissent perceives no deterrent value in excluding evidence seized by police who, without warrant or probable cause, but pursuant to common practice, conducted an exploratory search into a closed suitcase in the interior of a motor vehicle involved in an accident after the driver, suspected of no crime, had been taken to the hospital.

The test proposed by the dissent—that the exclusionary rule should be inapplicable to police activity the purpose of which is "neither the prosecution nor prevention of crime" (*post*, p. 262)—would permit, even encourage, unregulated exploratory searches by police officers of the persons or into the personal effects of individuals who, being suspected of no crime, would normally have a reasonable expectation of privacy and a constitutional right to be free of invasion of that privacy. (Cal. Const., art. I, § 13.) Without citation of any authority, the dissent proposes an anomalous doctrine: to preserve the constitutional rights of persons suspected of crime, but not of those whose conduct has given rise to no such suspicion.

off-ramp, approximately seven miles from San Rafael. At this time Officer Schultz of the California Highway Patrol and another officer while on a routine patrol observed defendant and the little boy standing at the intersection of the freeway and the off-ramp. Both defendant and the boy appeared to be urinating and as the officers approached, defendant was observed adjusting his clothing. He said something to the effect, "Oh, my God, it looks like we are going to be arrested." Defendant described to Schultz his predicament and his destination. He was unable to give the officers any identification, but said he lived in Alexandria, Virginia. In describing defendant's appearance Officer Schultz said, "He was intoxicated to the point he couldn't take care of himself or his son." Specifically, defendant's eyes were extremely bloodshot and his pupils were enlarged. He swayed back and forth, shifting his feet to maintain his balance. He was incoherent. The child appeared to be tired, cold, and was crying. The hour was 12:30 a.m.

At this point the officers made an in-the-field decision which, in my view, was eminently proper. They decided to take defendant and the child to their destination in San Francisco in order to return the child to his mother. One of the officers placed the child in the back seat of the patrol car, comforted him, and was able to stop his crying. Defendant started to follow the child into the back seat of the car, but before doing so, Officer Schultz asked that he submit to a pat-down search. Defendant then raised his hands preparatory to the search. In doing so, defendant's coat pocket was partially open and Schultz observed therein a plastic bag containing what Schultz believed to be, and in fact was, marijuana. This disclosure occurred just before the pat-down. Defendant was then arrested. A subsequent search of the paper bag lying nearby revealed 454 LSD tablets in addition to 2 unopened cans of beer.

Given the foregoing circumstances, three principles appear applicable. First, since the police had probable cause to arrest the defendant, a pat-down search was justified. In my view, when such probable cause exists but the police decide, for valid reasons to transport the individual away from the scene rather than arrest, they may conduct a pat-down search preparatory to such action. Second, the officers in the instant case had a positive duty to assist defendant and his son, and a pat-down search for the officers' own protection was amply warranted as a reasonable incident to any of the responsible options available to the officers. Third, the exclusionary rule invoked by the majority should not, as a general proposition, be applied to "searches" made in the exercise of police purposes unrelated to the investigation or prosecution of a crime. Contrary to the majority view, each of these principles, far from carving

out "totally new" or "unprecedented" exceptions to "universally accepted" principles is well founded in existing case law, as well as in logic and in sound public policy.

### 1. *Probable Cause to Arrest*

Under present law, if probable cause to arrest exists and the individual is formally arrested, he is subject to a pat-down search before being transported to the police station. (*Chimel* v. *California* (1969) 395 U.S. 752 [23 L.Ed.2d 685, 89 S.Ct. 2034]; *People* v. *Superior Court (Simon)* (1972) 7 Cal.3d 186, 201 [101 Cal.Rptr. 837, 496 P.2d 1205]; *People* v. *Superior Court (Kiefer)* (1970) 3 Cal.3d 807, 812-813 [91 Cal.Rptr. 729, 478 P.2d 449, 45 A.L.R.3d 559].) If probable cause to arrest exists but the individual is *not* arrested, there is no valid reason why the individual should not be subject nevertheless to a limited search, less intrusive than arrest, as an alternative way of dealing with the situation. I am unable to see how the alternative—arrest and search, with its necessary additional restraints on the individual's freedom, offers any greater constitutional protection than the search alone.

The majority insist that unless an individual is actually arrested, an officer must have reason to believe he is dealing with an armed and dangerous person before conducting a pat-down search. Such a conclusion is in no way compelled by present law. The authority on which the majority rely for this proposition, *Terry* v. *Ohio* (1968) 392 U.S. 1 [20 L.Ed.2d 889, 88 S.Ct. 1868], applies specifically only to those situations in which the officers *lacked probable cause* to arrest, rather than to cases where, as here, such probable cause existed but the officers chose not to arrest. The majority extract a portion of a sentence from *Terry* which, out of context, appears to support their proposition. This sentence in full reads: "Our evaluation of the proper balance that has to be struck in this type of case leads us to conclude that there must be a narrowly drawn authority to permit a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime." (*Id.,* at p. 27 [20 L.Ed.2d at p. 909].) With all due deference, I suggest that the above quotation means that when the police believe that an individual is armed and dangerous, they may search for weapons even without probable cause to arrest; it does not mean, as the majority assert, that an individual must be armed and dangerous in order to justify a search even where there is probable cause.

To the contrary, *Terry* assumes that if probable cause to arrest does exist, a search is proper. (*Id.,* at pp. 15-16, 20, 25, 27 [20 L.Ed.2d at pp. 902-903, 905, 908, 909].) Specifically, the *Terry* court characterizes the question before it as ". . . whether it is always unreasonable for a policeman to seize a person and subject him to a limited search for weapons *unless* there is probable cause for an arrest." (*Id.,* at p. 15 [20 L.Ed.2d at p. 902], italics added.) Further, *Terry* continues: "A search for weapons *in the absence of probable cause to arrest* . . . must, like any other search, be strictly circumscribed by the exigencies which justify its initiation." (*Id.,* at pp. 25-26 [20 L.Ed.2d at p. 908], italics added.)

Likewise, in *People* v. *Superior Court (Simon), supra,* 7 Cal.3d 186, the other case on which the majority rely, the search was found to be defective because there was *no probable cause* to arrest the defendant for a nontraffic arrest. (*Id.,* at pp. 195-198.) There is no language in *Simon* that fairly suggests that if probable cause had existed to arrest for a nontraffic offense, the search would nonetheless be improper because no arrest was made.

The majority concede that the circumstances surrounding the pat-down search offered probable cause to arrest, and this is amply supported by the record. The particular statutes under which an arrest might have been effected include the following: Penal Code sections 647, subdivision (f) (drunkenness); 273g (drunkenness in the presence of a child); 272 (contributing to the delinquency of a minor); 374b (depositing waste matter on a public right of way); and additionally, at least two Vehicle Code sections, 21960 (pedestrian on a freeway) and 21957 (hitchhiking). Whenever probable cause to arrest exists, despite a lack of intention to arrest, the delicate balance between individual rights and society's interest in having the police safely carry out their duties shifts in favor of permitting the limited pat-down search. Thus on this basis alone, I would uphold the search.

### 2. *Police Duty to Act*

It is now established in California that a patdown search is proper when an officer is under a duty to transport an arrestee who is properly in their custody. (*People* v. *Norman* (1975) 14 Cal.3d 929, 935-936 [123 Cal.Rptr. 109, 538 P.2d 237]; *People* v. *Longwill* (1975) 14 Cal.3d 943, 949-950 [123 Cal.Rptr. 297, 538 P.2d 753]; *People* v. *Brisendine* (1975) 13 Cal.3d 528, 536-537 [119 Cal.Rptr. 315, 531 P.2d 1099].)

Under the circumstances of this case, I would conclude that the officers had a duty to transport defendant and his son away from the scene, even if defendant was not placed under arrest. The same policy considerations supporting the rule in the cases cited above, are equally applicable in this situation. As noted in the concurring opinion in *Simon:* "The critical factor in these or similar situations is not the greater likelihood that a person taken into custody is armed, but rather the increased likelihood of danger to the officer if in fact the person is armed." (*Simon, supra,* at p. 214, Chief Justice Wright concurring; see also *People* v. *Brisendine, supra,* at p. 537.) Thus, in my view, the pat-down search was justified incident to the transportation of defendant and his son to a place of safety.

The majority, while expressing sympathy for the predicament of the officers (indeed, offering commendation for their restraint), nonetheless propose a rule that requires the officers to inform defendant that he may either decline the ride or submit to a pat-down. Such a novel requirement under the facts of this case is, I suggest, wholly unrealistic. Assuming he is sober enough to exercise his "options," suppose defendant declines the ride? What then? Under the majority's view presumably one of two things occur. Either (a) defendant and his son are left on the freeway, or (b) the officers arrest defendant before conducting a pat-down search and transporting him. Alternative (a), abandonment of defendant and his child, is, in my view, absolutely unthinkable. The multiple hazards and risks to both defendant and child are so numerous and obvious as to require no mention. It would constitute negligence and inattention to duty to leave an inebriated man, possessing no identification, with a three-year-old child who is tired, cold, and frightened, alongside a freeway in a rural area at 12:30 in the morning in the middle of winter.

The remaining option in the majority's view, alternative (b), is to arrest defendant. This is an option which the officers, in the exercise of their "in-the-field" discretion, specifically decided for valid reasons was not a desirable one. Their stated reasons were: ". . . it was 12:30 at night. We would have to get a receiving home for the boy and we thought it would be better if we just took him on home, and instead of taking him to jail for just [being] drunk." The effect of the majority holding is to force an arrest in a situation where the officers desire only to protect themselves by a limited intrusion of defendant's person while carrying out their general protective duties.

I respectfully suggest that application of a rule of such wooden rigidity contains, to borrow the majority's phrasing, "potential ramifications" for ill. It also, in my view, ignores and deprives the police of that discretion which public policy requires be vested in them in the discharge of a very important area of their responsibility—their caretaker and protective function. The nonlaw enforcement duties discharged by Officer Schultz and his companion in the matter before us are commonly accepted and widely recognized. *Terry* itself contemplates this precise kind of police activity that involves neither the investigation nor enforcement of the criminal laws: "Encounters are initiated by the police for a wide variety of purposes, some of which are wholly unrelated to a desire to prosecute for crime. . . ." (*Terry* v. *Ohio, supra,* 392 U.S. 1, 13 [20 L.Ed.2d 889, 901].) ". . . This sort of police conduct may, for example, be designed simply to help an intoxicated person find his way home, with no intention of arresting him unless he becomes obstreperous. . . ." (*Id.,* at p. 13, fn. 9 [20 L.Ed.2d at p. 901].)

The general protective duties of police are a vital part of police activity, and there has been increasing emphasis on the need for expansion of the police role beyond that of mere apprehension and arrest of criminal suspects. The National Advisory Commission on Criminal Justice Standards and Goals, Police (1973) encourages the exercise of this nonarrest function: "Every police agency . . . immediately should divert from the criminal and juvenile justice systems any individual who comes to the attention of the police, and for whom the purpose of the criminal or juvenile process would be inappropriate, or in whose case other resources would be more effective." (*Id.,* at p. 80.) Recognition of the protective role to be played by the police has been extended by the American Bar Association in the ABA Standards Relating to the Administration of Criminal Justice, Compilation (1974), outlining the "Major Current Responsibilities of Police": ". . . [M]ost police agencies are currently given responsibility, by design or default: . . . (iii) to aid individuals who are in danger of physical harm: . . . (v) to facilitate the movement of people and vehicles; (vi) to assist those who cannot care for themselves; . . . and (xi) to provide other services on an emergency basis." (*Id.,* at p. 15, see also Com. on Peace Officer Standards and Training, State of Cal., Behavioral Objectives for Post Basic Course (1975) §§ 10.1.2, 10.16 et seq., 63.1 et seq.)

The circumstances of the present case do not suggest to me that a responsible police officer should be *required,* as the majority insist, either to arrest defendant or to leave him alone. In my view, the responsible

options were either to transport defendant and his son to a safe place, or arrest defendant and take the child into custody under Welfare and Institutions Code section 600 or section 625. Under either of these options, transportation of defendant was required and thus a pat-down search would have been warranted. I think it unwise to limit the discretion vested in officers in the exercise of their essentially noncriminal, protective duties, by requiring that they arrest an individual in order to conduct a pat-down search for their own protection. Requiring an arrest, with all of its subsequent criminal implications, under these circumstances, serves neither public policy nor the private constitutional interests of the defendant himself.

### 3. *Nonapplicability of the Exclusionary Rule*

A third reason prompts me to dissent. In my view, neither the stated purposes nor the function of the exclusionary rule are served by its application in a noncriminal setting. As previously noted, in the case before us, the police were engaged in neither the investigation nor prosecution of crime. Indeed, they specifically rejected their law enforcement role. Given ample opportunity and cause to arrest in the exercise of their discretion, they elected to pursue their protective responsibilities to the citizenry by means short of the invocation of the criminal process.

Against this setting, I note that the United States Supreme Court initially justified the exclusionary rule as a necessary deterrent to improper police conduct. "The rule is calculated to prevent, not to repair. Its purpose is to deter—to compel respect for the constitutional guaranty in the only effectively available way—by removing the incentive to disregard it." (*Elkins* v. *United States* (1960) 364 U.S. 206, 217 [4 L.Ed.2d 1669, 1677, 80 S.Ct. 1437]; see also *Mapp* v. *Ohio* (1961) 367 U.S. 643, 656 [6 L.Ed.2d 1081, 1090, 81 S.Ct. 1684, 84 A.L.R.2d 933].) For several years the Supreme Court appeared to depart from this conception of the rule, treating it as a personal right rather than as part of a regulatory scheme designed to insure the collective security of citizens in freedom from unreasonable searches. Thus, the court held that an individual must have "standing" in order to assert a Fourth Amendment defense (*Alderman* v. *United States* (1969) 394 U.S. 165, 174 [22 L.Ed.2d 176, 187, 89 S.Ct. 961]; *Brown* v. *United States* (1973) 411 U.S. 223, 230 [36 L.Ed.2d 208, 214-215, 93 S.Ct. 1565]), and that the reasonableness of a search is determined on the basis of objective rather than subjective criteria. (*Cupp* v. *Murphy* (1973) 412 U.S. 291, 295 [36 L.Ed.2d 900, 905, 93 S.Ct. 2000]; *Chimel* v. *California, supra,* 395 U.S. 752 at pp. 762-764

[23 L.Ed.2d 685 at pp. 693-695]; see Amsterdam, *Perspectives on the Fourth Amendment* (1974) 58 Minn.L.Rev. 349, 367-374.)

Recently the Supreme Court has rejected this "personal right" concept and recognized that the only real justification for the exclusionary rule lies in its deterrent value. In reaching its conclusion that evidence seized illegally should not be excluded from a grand jury hearing, the court stated: "The purpose of the exclusionary rule is not to redress the injury to the privacy of the search victim . . . . Instead, the rule's prime purpose is to deter future unlawful police conduct and thereby effectuate the guarantee of the Fourth Amendment against unreasonable searches and seizures . . . . In sum, the rule is a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved." (*United States* v. *Calandra* (1974) 414 U.S. 338, 347-348 [38 L.Ed.2d 561, 571, 94 S.Ct. 613], citations and fn. omitted; see also *Michigan* v. *Tucker* (1974) 417 U.S. 433, 446-447 [41 L.Ed.2d 182, 194-195, 94 S.Ct. 2357]; *Bivens* v. *Six Unknown Fed. Narcotics Agents* (1971) 403 U.S. 388, 415 [29 L.Ed.2d 619, 637-638, 91 S.Ct. 1999] (Chief Justice Burger dissenting).)

Like the United States Supreme Court, we have from the beginning justified the exclusionary rule primarily as a deterrent made necessary by the failure of other means to regulate improper police conduct. Thus, in adopting the federal exclusionary rule (*Weeks* v. *United States* (1914) 232 U.S. 383 [58 L.Ed. 652, 34 S.Ct. 341]), in *People* v. *Cahan* (1955) 44 Cal.2d 434, 445 [282 P.2d 905, 50 A.L.R.2d 513], we said, "We have been compelled to reach that conclusion because other remedies have completely failed to secure compliance with the constitutional provisions on the part of police officers with the attendant result that the courts under the old rule have been constantly required to participate in, and in effect condone, the lawless activities of law enforcement officers." While frequently describing as a further justification for the rule the desire to keep the court from participating in illegal conduct (e.g., *People* v. *Benford* (1959) 53 Cal.2d 1, 15 [345 P.2d 928]; *Kaplan* v. *Superior Court* (1971) 6 Cal.3d 150, 155-156 [98 Cal.Rptr. 649, 491 P.2d 1]), we have focused primary concern on the deterrent effect of the rule. Thus, recently we stated: "Whether the exclusionary rule should be invoked depends . . . on whether to do so would deter the particular governmental employee, and others similarly situated, from engaging in illegal searches of private citizens." (*Dyas* v. *Superior Court* (1974) 11 Cal.3d 628, 635 [114 Cal.Rptr. 114, 522 P.2d 674]; see also *People* v. *Superior*

*Court (Simon), supra,* at p. 198; *People* v. *Moore* (1968) 69 Cal.2d 674, 682 [72 Cal.Rptr. 800, 446 P.2d 800].) And in *In re Martinez* (1970) 1 Cal.3d 641 [83 Cal.Rptr. 382, 463 P.2d 734], we refused to apply the exclusionary rule in a parole revocation case in part because we decided the increased deterrent effect of applying the rule in such cases would be slight. (*Id.,* at pp. 649-650.)

Since the purpose for and justification of the exclusionary rule lie in its deterrent capability, it makes no sense to apply it in situations, like the one before us, in which the object of the police activity is not the prosecution of crime. If no criminal prosecution is contemplated or sought at the time of the police activity, the fact that any evidence discovered by the police activity will be excluded in a criminal prosecution will not deter police conduct.

This reasoning is, in my view, the precise import of the United States Supreme Court's language in *Terry* v. *Ohio, supra,* 392 U.S. 1, in the context of searches incident to field interrogations. "The exclusionary rule has its limitations . . . as a tool of judicial control. . . . [I]n some contexts the rule is ineffective as a deterrent. . . . Encounters are initiated by the police for a wide variety of purposes, some of which are wholly unrelated to a desire to prosecute for crime [including helping an intoxicated person find his way home]. . . . Doubtless some police 'field interrogation' conduct violates the Fourth Amendment. But a stern refusal by this Court to condone such activity does not necessarily render it responsive to the exclusionary rule. Regardless of how effective the rule may be where obtaining convictions is an important objective of the police [fn. omitted], it is powerless to deter invasions of constitutionally guaranteed rights where the police either have no interest in prosecuting or are willing to forgo successful prosecution in the interest of serving some other goal." (*Id,* at pp. 13-14 [20 L.Ed.2d at pp. 901-902].) It is clear to me, under the rationale of *Terry,* that no deterrent purpose is served by excluding evidence which is the product, as here, of activities undertaken by the police acting in their protective capacity.

There is language in *Mozzetti* v. *Superior Court* (1971) 4 Cal.3d 699 [94 Cal.Rptr. 412, 484 P.2d 84], to the effect that police officers are not "exempt" from the reasonable search requirement of the Fourth Amendment "[m]erely because the police are not searching with the express purpose of finding evidence of crime . . . ." (P. 706.) I agree with this statement, and with *Mozzetti's* holding that a purported "inventory" search of a *closed* suitcase in the trunk of a car in police custody

constituted an unreasonable invasion of privacy. Nonetheless, not all police conduct which invades privacy necessarily invokes an exclusionary rule, as opposed to some lesser form of sanction. In those situations, as in the present case, where police officers are not seeking to discover incriminating evidence but instead "stumble upon" contraband or other evidence while engaged in noninvestigatory activity, no deterrent purpose would be served by excluding such evidence in a subsequent criminal proceeding. The inflexible and stubborn imposition of the exclusionary rule under such circumstances is simply too costly a price to pay for the limited invasion of a privacy interest.

In *Mozzetti,* we applied the exclusionary rule to exclude from a criminal prosecution the fruits of an improper automobile search, undertaken for the ostensible purpose of protecting the belongings of their owner. In that case, we focused on whether the intrusion was a search. We did not directly deal with the fundamental question which has been increasingly raised of whether the exclusionary rule should be applied whenever there has been an improper search even when the police are acting in their protective capacity and no deterrent purpose would be served. Interestingly, one of the principal Supreme Court cases relied upon by us in *Mozzetti* was *Terry* v. *Ohio, supra,* a case which, as I have indicated, seems to indicate that the rule should *not* be applied in such circumstances. The problem of whether the exclusionary rule should be applied in every case in which the search is held to be improper should now be closely scrutinized, as was not done in *Mozzetti,* in light of the purposes of the rule.

The majority herein suggest that the accommodation which I propose "would permit, even encourage, unregulated exploratory searches by police officers . . ." and would "preserve the constitutional rights of persons suspected of crime, but not of those whose conduct has given rise to no such suspicion." (Fn. 4.) To the contrary, I propose no such thing, and such conclusionary statements represent a gross misreading of this dissent. Police officers have no authority to conduct general "exploratory searches," and clearly any contraband or other incriminating evidence discovered as a result thereof would be subject to the exclusionary rule, whether or not the citizen so searched was a suspect. On the other hand, assuming for the sake of argument that the police officers in the present case exceeded their authority, they conducted no "exploratory search" but were acting solely in their "protective" capacity when they discovered the contraband at issue. Accordingly, I discern no sound basis for excluding the admission of such evidence, nor has any been suggested by

the majority other than the rote, automatic and mechanical application of the exclusionary rule.

To suggest that judicial lines be drawn properly delineating the reasonable ambit of the exclusionary rule is neither to weaken nor dilute its proper application in an appropriate area. The federal Supreme Court is in the process of defining reasonable limitations on the rule, bearing always in mind the primary deterrent purpose of the rule. (See e.g., *Michigan* v. *Tucker, supra,* 417 U.S. 433; *United States* v. *Calandra, supra,* 414 U.S. 338.)

In this redefinition process, leading academic authorities have emphasized the importance of a full understanding of the precise basis and reason for the rule and its application to specific areas of activity which reasonably can justify the rule. For example, Professor Amsterdam of the Stanford Law School in his profound analysis, *Perspectives on the Fourth Amendment* (1974) 58 Minn.L.Rev. 349, argues forcefully for a shift away from what he describes as an "atomistic" view of the exclusionary rule and a return to a more "regulatory" concept which recognizes that the rule is designed to protect individual rights, rather than constituting an individual right in itself. (*Id.,* at pp. 367-374, 437-439.) "The exclusionary rule is simply a tool to be employed in whatever manner is necessary to achieve the amendment's regulatory objective by reducing undesirable incentives to unconstitutional searches and seizures." (*Id.,* at p. 437.)

Similarly, Professor Kaplan, also of the Stanford Law School, in his penetrating review, *The Limits of the Exclusionary Rule* (1974) 26 Stan.L.Rev. 1027, suggests modifications of the rule, concluding that: "... the exclusionary rule does not have such an honorable or ancient lineage that it should be maintained without reference to the validity of its justifications; ..." (*Id.,* at p. 1029, fn. omitted.)

Professor Kaplan argues for a more flexible application of the rule, properly noting the effects of appropriate modifications: "For those who are wedded to the present rule, and even more for those who would expand it, any restriction would be a retreat in the face of the enemy, a cutting back when it is most necessary to hold firm. A cutting back of the exclusionary rule, however, can also be regarded as a pruning, a method of making it more acceptable and hence more lasting; it is indeed a method of giving more, not less, protection to fourth amendment values." (*Id.,* at p. 1045.)

The exclusionary rule should be subject to reasonable restrictions, one of which, in my view, should limit the rule to its correct regulatory role. It should not apply to cases such as the one at bar in which the purpose of the police activity is neither the prosecution nor prevention of crime. This limitation may, on occasion, raise difficult problems of proof, but this difficulty is a common one in the law (see, e.g., *People* v. *Brisendine, supra,* 13 Cal.3d 528 at pp. 534-535) and is not so acute as to require automatic application of an overbroad rule, the effect of which tends to sacrifice other important societal interests.

In conclusion, I suggest that where, as here, circumstances combine and give rise to a probable cause to arrest, but the police in discharge of their obligation to protect the citizenry and for good reasons elect not to arrest, reasonable precautionary measures carefully tailored to the situation, are proper. These precautionary measures, in my opinion, may include a pat-down search, described by us in *People* v. *Brisendine, supra,* 13 Cal.3d 528, 537, as a "minimal intrusion" on a person's privacy. The factual situation before us was unusual. The police did not manufacture a pretext. Their objectives are described by the majority as "laudatory." Their methods prompted the trial judge who excluded the evidence to observe: ". . . I would have done precisely what [the officers] did under the circumstances . . . ." The police errand was one of mercy. This was not rampant, arbitrary, impulsive, unthinking police action. Rather, the record discloses the protective arm of government, restrained, moderate, helpful, carefully adapted to the realities and exigencies of an unusual factual situation. Such police action is to be encouraged rather than discouraged. In my opinion the pat-down was fully justified, and was not "unreasonable" within the fair meaning either of the Fourth Amendment of the federal Constitution or article I, section 13, of the California Constitution.

Even if this limited search was improper, however, I would not rigidly apply the exclusionary rule in a case such as this one in which the police were clearly engaged in their protective rather than their crime prevention capacity. No purpose is served by such an application.

For these reasons I would affirm the trial court's judgment of conviction.

McComb, J., and Clark, J., concurred.

Respondent's petition for a rehearing was denied March 24, 1976. McComb, J., Clark, J., and Richardson, J., were of the opinion that the petition should be granted.