Filed 11/22/13  P. v. McKinney CA

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | |
| v. | G047331 |
| JOHN  KIRK McKINNEY, | (Super. Ct. No. 09CF1955) |
| Defendant and Appellant. | O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Thomas M. Goethals, Judge.  Affirmed.

Sharon M. Jones, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Melissa Mandel and Scott C. Taylor, Deputy Attorneys General, for Plaintiff and Respondent.

Appellant was convicted of murdering Cecil Warren in the second degree. He contends 1) the admission of certain statements Warren made to the police at the scene of the crime violated his confrontation rights; and 2) the trial court prejudicially erred in failing to instruct the jury on involuntary manslaughter. We reject these claims and affirm the judgment.

FACTS

On November 11, 2003, at around 4:45 a.m., Henry Stoltenberg was taking his usual morning walk in Huntington Beach. On past walks at that hour, Stoltenberg had seen Warren doing gardening work near the Union Bank on Beach Boulevard. However, that morning, Stoltenberg discovered Warren lying in the bank's parking lot. Warren, then age 77, was curled up in the fetal position near his van, and upon approaching him, Stoltenberg noticed his face was swollen and bloody. Warren also seemed groggy and disoriented. He said he had been mugged, so Stoltenberg called 911.

About five minutes later, Huntington Beach Police Officer Rodney Besuzzi arrived at the scene and contacted and spoke to Warren, who was still bleeding and woozy. During the course of their conversation, Besuzzi asked Warren what happened. He also asked him, "Who did this to you," "what was taken," were "there any weapons involved," and "which way did these people go?" Although Warren was not entirely coherent at the time, he was able to answer Besuzzi's questions.

Warren said he was removing an edging tool from the back of his van when he was approached by two men who were either black or Hispanic. They were both wearing tan jackets and about five-foot eight, and one of them was wearing an earring. They demanded his money, and when he said he didn't have any, one of the men struck him in the face with his fist or some kind of object. Then the other man struck him in the face, and one of them took his wallet before they ran off together in a southerly direction. Warren estimated Stoltenberg found him on the ground about 20 minutes after the men departed.

2

Warren was transported to the hospital around 5:30 a.m. Shortly after he arrived there, he slipped into a coma and was placed on life support. He never regained consciousness.

As part of their investigation, the police interviewed appellant on November 22, 2003. At first he denied having anything to do with the assault. But he eventually admitted he and his friend "CJ" were the two men Warren had encountered. Appellant said it was CJ's idea to approach Warren's van. Appellant tried to talk him out of it, but CJ started removing stuff from the van, and Warren walked up and asked him what he was doing. CJ punched Warren in the face, causing him to fall. Appellant told police that when CJ hit Warren, he backed away, not wanting to get involved. He also claimed he never spoke to, hit, or took anything from Warren during the incident.

The police determined CJ was Curtis James Hill, who like appellant, lived in the area where the incident occurred. The police also determined Hill's DNA profile matched the DNA profile of a hair that was found on the right rear pocket of Warren's jeans.

Appellant and Hill were originally charged with assault and robbery. Hill pleaded guilty to the charges, and appellant was convicted by a jury. On appeal to this court, appellant argued Officer Besuzzi's testimony about the statements Warren made to him at the scene of the crime violated his confrontation rights because Warren did not testify at trial. However, we determined Warren's statements were not testimonial within the meaning of the confrontation clause because "the primary purpose of Besuzzi's questioning of Warren was 'to enable police assistance to meet an ongoing emergency.' [Citation.]" (*People v. McKinney* (May 13, 2008, G038213) [nonpub. opn.] at p. 3 (*McKinney I*).) Therefore, we ruled their admission did not violate appellant's confrontation rights. (*Ibid.*)

While appellant's appeal was pending, Warren passed away, at the age of 81. The prosecution then charged appellant and Hill with first degree special

3

circumstances murder for killing Warren during the commission of a robbery. At trial, appellant argued he did not participate in the assault on Warren, and the assault was not the cause Warren's death. The jury disagreed. While it acquitted appellant of first degree murder, it convicted him of murder in the second degree. The trial court sentenced him to 15 years to life in prison.[1]

## I

As he did in his first appeal, appellant argues Officer Besuzzi's testimony about the statements Warren made to him at the scene of the crime violated his confrontation rights. We still disagree.

The admissibility of Warren's statements to Besuzzi was litigated before trial. At the outset of the hearing, the prosecutor argued our previous holding in *McKinney I* that Warren's statements were nontestimonial was binding under the law of the case doctrine. The trial court rejected that argument. However, after hearing Besuzzi testify during an Evidence Code section 402 hearing, the court agreed with our prior ruling that Warren's statements to Besuzzi were nontestimonial because they were elicited during the course of an ongoing emergency. Therefore, the court allowed Besuzzi to testify about the statements Warren made to him at the scene of the crime.

Before addressing the propriety of that ruling, we need to take up a procedural issue raised by the Attorney General. She contends that, contrary to the trial court's ruling, *McKinney I* did in fact decide the law of the case with respect to appellant's confrontation claim. Appellant counters the state waived its right to raise that issue on appeal by failing to challenge the trial court's ruling by way of a pretrial writ. However, as we've explained, the trial court ultimately ruled in the state's favor on the confrontation clause issue and allowed the prosecution to introduce Warren's statements through Besuzzi. Because the state was not prejudiced by the trial court's ruling on the

---

[1]     Hill was tried separately and convicted as charged. His appeal involved issues that are unrelated to those raised by appellant in this case. (*People v. Hill* (Nov. 5, 2013, G046249) [nonpub. opn.].)

4

law of the case doctrine, it would not have been able to obtain writ relief on that ruling. (See *Omaha Indemnity Co. v. Superior Court* (1989) 209 Cal.App.3d 1266, 1273-1274.) Therefore, the prosecution's failure to seek writ review does not preclude the state from raising the law of the case issue on appeal.

Nevertheless, we agree with the trial court that the law of the case doctrine is inapplicable here. "In essence the doctrine provides that when an appellate court has rendered a decision and states in its opinion a rule of law necessary to the decision, that rule is to be followed in all subsequent proceedings *in the same action*." (*People v. Scott* (1976) 16 Cal.3d 242, 246, italics added and fn. omitted.) Although the present case arises from the same underlying facts as *McKinney I*, it is a separate case that was tried in front of a separate jury. Moreover, the issue concerning the admissibility of Warren's statements to Besuzzi was litigated anew in this case. Therefore, we will proceed to the merits of appellant's claim.

At the Evidence Code section 402 hearing, Besuzzi testified about the circumstances of his encounter with Warren at the scene of the crime. He said the only thing he knew when he responded to the scene is that someone had been "mugged." He did not know how many suspects were involved or if a weapon had been used during the incident. Besuzzi was the first officer to arrive at the scene, and although Stoltenberg was in the vicinity, he talked to Warren first. At that time, the area was unsecured, and the paramedics had yet to arrive.

Describing his interaction with the victim, Besuzzi testified Warren's face was bleeding, and he was a bit unfocused. Besuzzi had to "redirect [his] questions [to Warren] more than once to try and ascertain [] exactly what happened." Warren did not know if his assailants had a weapon. And even though he said they fled in a southerly direction, it was not known if they had a vehicle or if they were still in the area. Besuzzi's purpose in questioning Warren was to gather information that could be dispatched "over the police radio for surrounding officers so they would know what to

5

encounter if they did [] see or approach one of [the] suspects." Besuzzi felt it was important to obtain as much information as possible "for the officer's safety" and so they could "protect the people living in that area."

The information Besuzzi obtained from Warren was also pertinent in helping him determine if the scene was secure enough to allow medical personnel into the area. As it turned out, the paramedics arrived a couple minutes after Besuzzi began talking to Warren. By that time, Warren had already provided Besuzzi with a description of the suspects and an account of how the assault took place. That information was promptly broadcast to other officers in the area who were looking for the perpetrators of the assault.

As interpreted in *Crawford v. Washington* (2004) 541 U.S. 36, the Sixth Amendment's Confrontation Clause prohibits testimonial hearsay unless the declarant is unavailable for trial and the defendant had a prior opportunity to cross-examine him or her. In contrast, out-of-court statements that are nontestimonial do not implicate the Sixth Amendment and thus do not require a showing of unavailability and prior opportunity for cross-examination. (*Davis v. Washington* (2006) 547 U.S. 813.)

"Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." (*Davis v. Washington, supra*, 547 U.S. at p. 822, fn. omitted.)

Appellant admits that some of the statements Warren made to Besuzzi were nontestimonial because they were elicited to help Besuzzi deal with an ongoing emergency. This would include any information Warren provided about the description of his assailants and whether they had a weapon. However, appellant insists Warren's

6

statement that he was hit by the second suspect before his wallet was taken should have been excluded as testimonial.

It is doubtless true that the nature of a declarant's statements can change over the course of an interview. As the United States Supreme Court stated in *Michigan v. Bryant* (2011) 562 U.S. __ [131 S.Ct. 1143], "'a conversation which begins as an interrogation to determine the need for emergency assistance' can 'evolve into testimonial statements.' [Citation.] This evolution may occur if, for example, a declarant provides police with information that makes clear that what appeared to be an emergency is not or is no longer an emergency or that what appeared to be a public threat is actually a private dispute. It could also occur if a perpetrator is disarmed, surrenders, is apprehended, or . . . flees with little prospect of posing a threat to the public." (*Id*. at p. 1159.)

With this in mind, appellant argues "the fact that both suspects may have taken turns striking Warren was entirely unnecessary to an assessment of present danger or to assist in the apprehension of the suspects. Indeed, the only conceivable purpose of this information was to produce evidence for possible use at a subsequent criminal trial." We cannot agree.

Knowing the extent of each suspect's involvement in the attack would naturally help the police ascertain the potential danger the suspects posed to the police and the public at large. Indeed, that information was fundamental to knowing what happened and gauging how the police might handle any potential encounter with the suspects. In addition to showing the suspects' violent tendencies, the fact they *both* hit Warren was useful to know in terms of assessing the seriousness of Warren's injuries and responding to his medical emergency. Since the manner and method by which a victim is injured can often dictate the manner and method of treatment, the information was pertinent to helping Besuzzi deal with the situation he faced as the first police officer on the scene.

7

That situation was not much different than the one faced by the responding officers in *Michigan v. Bryant, supra,* 562 U.S. __ [131 S.Ct. 1143]. In that case, the police found the victim in the parking lot of a gas station after he had been shot about 25 minutes earlier. Due to his injuries, the victim was in considerable pain and having difficulty talking and breathing. And the responding officers did not know the location of the perpetrator when they arrived on the scene. Because the scene was unsecured, the situation was "fluid and somewhat confused," and the officers "did not conduct a structured interrogation" with the victim, the Supreme Court determined his responses to the officers' questions were nontestimonial. (*Id.* at pp. 1165-1167.)

Specifically, the court held: "The questions [the officers] asked [the victim] — 'what had happened, who had shot him, and where the shooting occurred,' [citation] — were the exact type of questions necessary to allow the police to '"assess the situation, the threat to their own safety, and possible danger to the potential victim"' and to the public, [citation], including to allow them to ascertain 'whether they would be encountering a violent felon,' [citation]. In other words, they solicited the information necessary to enable them 'to meet an ongoing emergency.' [Citation.]" (*Michigan v. Bryant, supra,* 131 S.Ct. at p. 1166.) Therefore, the admission of the victim's statements at the defendant's trial did not violate the Sixth Amendment. (*Id.* at p. 1167.)

The obvious difference between *Bryant* and the case at hand is that the victim in *Bryant* had been shot, whereas Warren had been physically attacked by his assailants. However, in terms of the overall situation faced by the responding officers, there is not a material difference between the two cases. In both cases, the victim had been recently injured and was in need of immediate medical attention, the suspects were violent and still at large, and the officer's questions were informal and geared toward shaping an appropriate response to the situation at hand. Viewed objectively, the primary purpose of the questioning in both cases was to help the police respond to an ongoing emergency, as opposed to eliciting incriminating statements for use in a criminal

8

prosecution. Whether there were two violent felons or one violent felon and one aider and abettor was extremely valuable in fashioning an appropriate response.

Therefore, like the high court in *Bryant*, we find no violation of the Sixth Amendment in this case. The trial court did not err in allowing Besuzzi to testify about the statements Warrant made to him at the scene of the crime. (*Michigan v. Bryant, supra,* 131 S.Ct. at p. 1167; *People v. Blacksher* (2011) 52 Cal.4th 769, 811-817 [declarant's statements to the police about a recent shooting, what the gunman was wearing and whether he was armed were nontestimonial because their primary purpose was to help the police "deal with (an) emergency, not to create an out-of-court substitute for trial testimony"]; *People v. Romero* (2008) 44 Cal.4th 386, 422 [victim's description of the defendant's attack on him was nontestimonial in that it "provided the police with information necessary for them to assess and deal with the situation, *including taking steps to evaluate potential threats to others by the perpetrators, and to apprehend the perpetrators.*"].)

II

Appellant also contends the trial court prejudicially erred in failing to instruct the jury on involuntary manslaughter. Again, we disagree.

Appellant was charged with felony murder on the theory he either participated in or aided and abetted the killing of Warren during the commission of a robbery. He was acquitted of that charge but found guilty of the lesser included offense of second degree murder on the theory he acted with implied malice, i.e., conscious disregard of life. Although appellant requested instructions on theft, as a lesser included offense of robbery, the court did not instruct on that offense, and appellant does not challenge that decision on appeal. Instead, he argues the court should have instructed on the lesser included offense of involuntary manslaughter because the evidence shows Warren was killed during the commission of an unlawful act not amounting to a felony, i.e., simple battery. (See Pen. Code, § 192, subd. (b).)

9

"[A] trial court errs if it fails to instruct, sua sponte, on all theories of a lesser included offense which find substantial support in the evidence. On the other hand, the court is not obliged to instruct on theories that have no such evidentiary support. . . . [¶] . . . [T]he existence of '*any* evidence, no matter how weak' will not justify instructions on a lesser included offense . . . ." (*People v. Breverman* (1998) 19 Cal.4th 142, 162.) Rather, the defendant must show there is substantial evidence he committed only the lesser, and not the greater, offense. (*People v. Hughes* (2002) 27 Cal.4th 287, 367.)

Here, the evidence shows appellant and his companion Hill confronted the 77-year-old Warren early one morning while he was working outside. When Warren refused their demand for money, Hill struck him in the face with his fist or some sort of object. Then, on the heels of that initial blow, appellant struck Warren in the face a second time. The force of the blows not only floored Warren, leaving him dazed and confused, they caused him to lapse into a coma, which led to his eventual death.

While this evidence shows appellant committed a battery against Warren, thereby establishing the predicate misdemeanor for his involuntary manslaughter theory, his culpability clearly rises above the level of that offense. By punching the elderly Warren in the face after Hill had already clocked him, appellant engaged in an act that was wantonly dangerous and callously indifferent to human life. The evidence of second degree implied malice murder was sufficiently strong to obviate any need to instruct the jury on the lesser included offense of involuntary manslaughter.[2]

Even if the trial court erred in failing to instruct on that lesser offense, reversal is not required because, considering the record as a whole, it is not reasonably probable appellant would have obtained a more favorable result had the error not occurred, i.e., it is not reasonably probable appellant would have been convicted of

---

[2]     We focus on second degree murder as the greater offense because appellant was acquitted of first degree murder.

10

involuntary manslaughter as opposed to second degree murder. (*People v. Breverman, supra,* 19 Cal.4th at p. 178; *People v. Leal* (2009) 180 Cal.App.4th 782, 792.)

Besides contesting the issue of causation, appellant's primary argument at trial was that, while he was at the scene of the crime, he did not participate in or aid and abet the attack on Warren, i.e., he did not do *anything* criminal whatsoever. That claim is wholly inconsistent with appellant's involuntary manslaughter theory, which assumes he at least committed a battery against Warren. As such, it is not reasonably probable the jury would have found appellant guilty of only involuntary manslaughter. He put on an all-or-nothing defense and cannot now complain that no instruction was given to cover a half-a-loaf defense. Thus, any error in failing to instruct on that offense was harmless. (*People v. Waidla* (2000) 22 Cal.4th 690, 740-741 [failure to instruct on lesser included offenses harmless where defense theory was actual innocence]; *People v. Nakai* (2010) 183 Cal.App.4th 499, 511-512 [failure to instruct on lesser included offense harmless in light of defendant's theory of the case].)

DISPOSITION

The judgment is affirmed.


BEDSWORTH, J.


WE CONCUR:


RYLAARSDAM, ACTING P. J.


IKOLA, J.

11