ON MOTION FOR REHEARING EN BANC

MONACO, C.J.
We grant the motion for rehearing en banc requested by the State, withdraw our previously issued opinion, and substitute for it the following.
This case causes us to consider the parameters of the exigent circumstances doctrine as applied to a police officer’s discovery of proscribed substances incident to an attempt to fulfill his non-investigative obligations. Because we conclude, as did the trial judge, that the officer acted reasonably under the circumstances in entering the home of the appellant, Emmanuel Ortiz, without a warrant, we affirm.
I. Rehearing En Banc.
A rehearing en banc may be granted pursuant to Florida Rule of Appellate Procedure 9.331(a) when the case is of exceptional importance or in order to maintain uniformity in the court’s decisions. First, we note that the present case fleshes out the borders of both the “feared medical emergency” exception to the warrant requirement articulated by the Florida Supreme Court in Riggs v. State, 918 So.2d 274 (Fla.2005), and the now well-recognized community caretaking function of police officers. Unlike the dissent, we view both issues to be of exceptional importance, particularly in a day and age where society expects police officers to be deeply involved in humanitarian and life and property protection actions that go beyond traditional law enforcement duties. Underscoring this concept, the Riggs court quoted the United States Court of Appeals for the First Circuit to the effect that police officers fearing emergencies:
need [to make] an on-the-spot judgment based on incomplete information and sometimes ambiguous facts bearing upon the potential for serious consequences.
Riggs, 918 So.2d at 282 (quoting United States v. Martins, 413 F.3d 139, 147 (1st Cir.), cert. denied, 546 U.S. 1011, 126 S.Ct. 644, 163 L.Ed.2d 520 (2005)). Because the view of the original panel decision had potentially far-reaching negative effects on the actions of law-enforcement officers in fulfilling this function, the case is exceptionally important.
Finally, while the dissent asserts that the original panel decision did not conflict with Riggs, the majority has concluded otherwise. Indeed, Riggs compels a conclusion far different than that dictated by the original decision. Accordingly, we review this case en banc.
*598 II. Adjudicative Facts.
Mr. Ortiz pled nolo contendere to trafficking in cocaine and possession of drug paraphernalia, reserving the right to appeal the denial of his dispositive motion to suppress. He argues that a law enforcement officer’s warrantless entry into his home and the subsequent seizure of cocaine and drug paraphernalia were unconstitutional. We disagree.
At about 6:30 p.m. one evening, Sheriffs Deputy Herbert Mercado received a call from a local elementary school reporting that a six-year-old child’s parents failed to pick him up from an after-school program. The deputy indicated that he routinely received such calls, and in such instances “we usually exhaust our means to make contact” with the parents of the child before referring the child to the Department of Children and Families.
The school’s representative advised the deputy that the child was supposed to be picked up by 6:00, and that the school had been unable to contact the child’s parents by telephone. Because of the Sheriffs office’s policy to take reasonable steps to contact parents before turning a child over to the Department of Children and Families, Deputy Mercado proceeded to the school, and then drove the child to the address that the school provided as the child’s home. The deputy testified that the child told him that his parents were or should be home.
When the deputy and the child arrived at the house, the house appeared to be dark and it did not appear that anyone was home. From his vantage point in the street the officer was able to see no lights in the house, and no one answered when the child knocked on the front door. There was no car outside and nothing was obviously amiss. When the child received no response from his knocking on the front door, the child proceeded to the garage. The front garage door was not locked, and the child opened it, possibly with the deputy’s help.[1] From inside the garage, the deputy could now see a light on in the house. The child invited the deputy inside the home, saying “Come in. I’ll show you where my parents are.” The deputy and the child then entered the house in search of the parents. According to the deputy, “He (the child) basically just kind of walked randomly into the house, just looking for the parents. So I just, you know, followed him.” Immediately before entering the house, the deputy announced his presence, but got no response. After they looked around without finding anyone, the child took the deputy to the locked door of his parents’ bedroom. Oddly enough, the bedroom door was locked from the inside. The deputy knocked on the bedroom door and announced his presence. There was no answer. The time was now about 7:30, and no contact had yet been made with the child’s parents.
Concerned for the well-being of the parents, the deputy was able to unlock the door and enter the bedroom, possibly because “it had like a pinhole kind of way you can stick a pin in it and open it.” In any event, the deputy did not force the door open. Once in the bedroom, the deputy, still fearing for the health of the parents, looked “for a body” on and under the bed, as well as in the closets. When the deputy walked into the adjoining bathroom, however, he saw in plain view what turned out to be 34 grams of cocaine wrapped in baggies on the countertop. Moments later, Mr. Ortiz entered the room.
*599 The deputy asked him if he lived in the house and if the young boy was his son. After Mr. Ortiz answered both questions affirmatively, the deputy advised him of his Miranda[2] rights. Mr. Ortiz then admitted that the cocaine was his, and was subsequently arrested on several drug-related charges.
Mr. Ortiz moved to suppress the cocaine, contending that contrary to the State’s position, exigent circumstances did not justify a warrantless entry into his home, and specifically, the locked bedroom. He also argued that the six-year-old child did not have the authority to consent to the warrantless entry into the house. The trial court disagreed, explaining in part:
As far as going inside the bedroom, I think that’s key here, because if — it doesn’t matter what consent may have— given, what understanding there was by the defendant. If the officers did not have the right to be where they were, then the evidence has to be suppressed. That’s why I was very clear in asking what was not clear from the questioning, whether or not — in order to get to the bathroom where the contraband was found, whether or not the only access was through the bedroom door.
You know, again, when you look at the situation that we have here, when the child is directing — I think what’s critical here, that may be missing from other cases, is that you’ve got the child directing the officer to the bedroom of the parents, where the parents are, or where the child believes the parents would be or might be. And I believe that where he was, under the circumstances that he was — that he was in, the fact is also critical that there was no busting down of the door, but that a pick or a — whatever it was, to unlock the door, was used, I think it was reasonable within the context of the facts of the entire case.
So I do not believe at this point, that we are within — with the facts — within the facts that Wheeler [v. State, 956 So.2d 517 (Fla. 2d DCA 2007) ] provides. And I do believe that this is, again, because we are dealing with a child; we are dealing with a child having the apparent authority.
This is not the, my child is letting a complete stranger inside the house, but my child is letting a law enforcement officer who has been verified by the school board, in whose trust, care and custody the child has been placed — to reunite him with a parent. And I think, under the circumstances here, it is totally, completely reasonable, particularly since there was no violent — or destruction of property to get access.
There is absolutely nothing but clear, unambiguous, good intentions on the part of the police officer, to make sure that a child is returned to his family. And but for the fact that these items were left in plain view, I think the officer had every reasonable expectation from our society to make sure that somebody was not, where the child indicated a parent might have been, in ex-tremis.
So, for the reasons that have been stated, I believe that the officer acted reasonably and that this was not an unwarranted search or seizure of either the property or the — the search of the property or seizure of contraband. The motion, at this time, is denied for the reasons stated.
Mr. Ortiz subsequently entered a plea of nolo contendere to trafficking in cocaine and possession of drug paraphernalia, ex *600 pressly reserving his right to appeal the denial of his dispositive motion to suppress evidence.
III. Analysis.
Review of a motion to suppress is a mixed question of law and fact. The standard of review applicable to the factual findings is whether competent substantial evidence supports those findings. The standard of review applicable to the trial court’s application of the law to the factual findings is de novo. Tyson v. State, 922 So.2d 338, 339 (Fla. 5th DCA 2006) (citing McMaster v. State, 780 So.2d 1026, 1028 (Fla. 5th DCA 2001)).
A warrantless search of a home is initially presumed to be unreasonable, and thus, impermissible under the Fourth Amendment. Coolidge v. New Hampshire, 403 U.S. 443, 454-55, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). The presumption, however, is not deemed to be absolute or without flexibility. United States v. McGough, 412 F.3d 1232, 1237 (11th Cir.2005). Thus, because the keystone of a Fourth Amendment analysis is “reasonableness,” the warrant requirement is subject to certain important exceptions. Flippo v. West Virginia, 528 U.S. 11, 13, 120 S.Ct. 7, 145 L.Ed.2d 16 (1999); see also Brigham City, Utah v. Stuart, 547 U.S. 398, 403, 126 S.Ct. 1943, 164 L.Ed.2d 650 (2006). One of the recognized and emerging exceptions to the warrant requirement comes into play when a law enforcement officer is confronted with exigent circumstances.
In this regard we have come to recognize over the years that police officers frequently perform functions that are “totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.” See Cady v. Dombrowski, 413 U.S. 433, 441, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973). The United States Supreme Court has referred to this series of duties as “community care-taking functions.” Caretaking functions are performed by police officers because we expect them to take those steps that are necessary to “ensure the safety and welfare of the citizenry at large.” 3 La-Fave, Search & Seizure (4th Ed. 2004), § 5.4(c), pp. 201-202. See also United States v. Quezada, 448 F.3d 1005 (8th Cir.2006). Searches undertaken by a law enforcement officer in fulfilling his or her community caretaking functions focus on “concern for the safety of the general public.” See Dombrowski, 413 U.S. at 447, 93 S.Ct. 2523; Castella v. State, 959 So.2d 1285, 1292 (Fla. 4th DCA), review denied, 968 So.2d 556 (Fla.2007). Indeed, courts have traced the derivation of the emergency doctrine that we apply today to the recognized community caretaking function of law enforcement officers. See, e.g., United States v. Russell, 436 F.3d 1086, 1090 (9th Cir.2006); United States v. Bradley, 321 F.3d 1212, 1214 (9th Cir.2003).
One exigency that obviates the need for a warrant occurs when an officer is put in position to assist persons who are injured or threatened with injury. Mincey v. Arizona, 437 U.S. 385, 392, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978). Our courts have deemed it reasonable under such circumstances to forego the wait for a warrant. In Riggs, 918 So.2d at 278-79, the Florida Supreme Court had the opportunity to apply and discuss this exception in a case that guides our consideration of the present case.
In Riggs, a child was found wandering naked and alone in the early morning hours. The child was in the company of local residents when the police arrived. The deputies, acting in their caretaking capacity, decided to search a nearby apartment complex because they were con *601 cerned about the “welfare of the parents” and about “any type of child abandonment or anything like that.” Riggs, 918 So.2d at 276. The officers found a door to one apartment “slightly ajar,” and conjectured that “that was possibly where the child had come out of.” The officers pounded on the door, but got no answer. Id. at 276-77. Because they were concerned that something might have happened to the child’s caregiver, or that someone inside might need medical attention, the deputies entered the apartment. Id. at 277. There were three rooms in the apartment. Id. In the first they found nothing out of the ordinary. In the second they found seven potted marijuana plants and a fluorescent light suspended above them. Id. In the third they found Mr. Riggs and the child’s babysitter. The trial judge suppressed the evidence, concluding that there were no exigent circumstances. The Second District disagreed and noted that “[t]he officers believed it was their duty to see that the child’s caregiver was not incapacitated and justifiably entered the residence.” State v. Riggs, 890 So.2d 465, 467-68 (Fla. 2d DCA 2004). Our supreme court unanimously affirmed the district court, and held that “in entering Riggs’s apartment without a warrant, the deputies acted reasonably and consistent with the Fourth Amendment.” Riggs, 918 So.2d at 283.
Jurisdiction in Riggs was based upon conflict with the decision of the First District in Eason v. State, 546 So.2d 57 (Fla. 1st DCA 1989). In Eason an eight-year-old child was found wandering through an apartment complex about 8 a.m. The officers followed the boy to a specific apartment. The child pointed to a partially opened door and said, “Mommy’s in there,” or something to that effect. After the officers knocked and got no reply, they entered the apartment and found the boy’s caretakers in a room containing marijuana and drug paraphernalia. The trial court found the search to be lawful, but the district court reversed, saying:
[The officer] admitted that prior to entering Eason’s apartment he saw no evidence that the child had been, or was going to be, physically or mentally abused, saw no evidence that medical intervention was necessary, and saw no evidence of a murder or robbery. [He] also testified that, upon his arrival at the apartment complex, the child appeared to be in the care of a responsible adult. We must conclude, therefore, that the state did not satisfy its burden of proving that the officers had reasonable grounds to believe exigent circumstances existed.
Id. at 58-59. The Florida Supreme Court granted review because the Second District in Riggs applied a “rule of law to produce a different result in a case which involves the same facts as a prior case.” Riggs, 918 So.2d at 278 (quoting Mancini v. State, 312 So.2d 732, 733 (Fla.1975)). The high court approved the decision of the Second District in Riggs to the effect that the seized evidence should not have been suppressed, and disapproved Eason. Riggs, 918 So.2d at 283.
Our supreme court reached this conclusion based on a permutation of the doctrine of exigent circumstances; namely, “a feared medical emergency.” Riggs, 918 So.2d at 279. This variety of exigency is founded in two United States Supreme Court cases, Mincey, and Thompson v. Louisiana, 469 U.S. 17, 105 S.Ct. 409, 83 L.Ed.2d 246 (1984). Mincey describes the doctrine succinctly:
Numerous state and federal cases have recognized that the Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person *602 within is in need of immediate aid.... “The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency.”
Mincey, 437 U.S. at 392, 98 S.Ct. 2408 (quoting Wayne v. United States, 318 F.2d 205, 212 (D.C.Cir.), cert. denied, 375 U.S. 860, 84 S.Ct. 125, 11 L.Ed.2d 86 (1963)).
In applying the feared medical emergency exception in Riggs the Florida Supreme Court posed and answered two critical questions. First, whether the deputies had reasonable grounds to believe that the child’s caregiver might be in need of medical attention. The court answered that question affirmatively. Next, the court asked whether the deputies had reasonable grounds to connect the feared emergency to the apartment they entered. Once again, the high court answered affirmatively ■
In its analysis of the exigency exception the court rejected the suggestion that the deputies should have simply walked away from the open door, stating “[gjiven their reasonable fear of a medical emergency, the deputies did not have time to retreat and weigh their options.” Riggs, 918 So.2d at 282. The court added:
As the First Circuit recently explained, officers fearing emergencies often “need [to make] an on-the-spot judgment based on incomplete information and sometimes ambiguous facts bearing upon the potential for serious consequences.” See United States v. Martins, 413 F.3d 139, 147 (1st Cir.2005), cert. denied, 546 U.S. 1011, 126 S.Ct. 644, 163 L.Ed.2d 520 (2005). The deputies in this case made precisely such a judgment. The resulting invasion of privacy is one that prudent, law-abiding citizens can accept as the fair and necessary price of having the police available as a safety net in emergencies.
Id., at 282-83.
The identical principles obtained in the present case are demonstrated by a consideration here of the same two inquiries suggested by Riggs.
A. Whether the officer had reasonable grounds to believe that the child’s parents might be in need of medical attention.
The officer was fulfilling a laudable police function in attempting to reunite the child with his missing parents. He was not, it should be noted, acting to investigate and uncover a crime. We give weight to the fact that a proper function of the officer in these circumstances was to attempt to reunite the child with his parents, much as the supreme court implicitly did in Riggs.
Although the dissent concludes that there was no reason to believe that the parents were in the house and in possible need of medical or other assistance, we find ourselves in sharp disagreement with that proposition. At the time that’ the officer reached the house, the child indicated that his parents were inside and knocked on the door. When there was no answer forthcoming, the child led the officer to the unlocked garage door and either with or without the officer’s assistance, lifted the garage door. The officer could see a light on in the house, indicating that someone might be home, yet no one responded. Although the transcript does not say specifically, it appears that the child, followed by the officer, then entered the house through an unlocked door from the garage.
Had the officer acted unreasonably up to this point? We think not. Certainly the officer would reasonably conclude based on the historical facts and the inferences that *603 would logically be drawn from them that something was not right, and that prudence would dictate that he follow the child into the home. He knew that the parents were quite late in picking up the child at the school and could not be reached by phone. At 7:80 p.m., an hour and a half after the child was first supposed to be picked up by his parents, the officer found himself with the child in the unlocked garage of the child’s home, and he could see a light on in the unlocked house. Still, no one responded to his knock. Viewing these facts objectively, could the officer reasonably conclude that something was wrong? We and the trial judge, who considered the live testimony presented, agree that the answer to this inquiry is, yes.
Upon entering the house, still having charge of the child, the officer still saw no sign of the parents. Although the child indicated that his parents were likely in the bedroom, the officer found that the bedroom door was locked from the inside, and there was no response to his knock or announcement. At every incremental stage of this evolving scenario the officer reasonably followed his instincts leading him to the conclusion that there could well be a medical emergency under way or worse. Upon entering the bedroom, the officer said, in fact, that he searched for a body. Instead he found the drugs in plain view. There was nothing unreasonable about the officer’s behavior or his apprehensions that he was dealing with an emergent situation that demanded prompt action.
In this regard the trial judge specifically found that:
There is absolutely nothing but clear, unambiguous, good intentions on the part of the police officer, to make sure that a child is returned to his family. And but for the fact that these items were left in plain view, I think the officer had every reasonable expectation from our society to make sure that somebody was not, where the child indicated a parent might have been, in ex-tremis.
We agree.
B. Whether the officer had reasonable grounds to connect the feared emergency to the house that was entered.
This is easily acknowledged. All of the evidence pointed to the Ortiz residence as the site of the feared medical emergency.
IV. Conclusion.
In the final analysis, our consideration of this case requires us to balance two values that are important to all of us: our desire to have police officers perform the community caretaking function particularly in perceived emergent circumstances, and the warrant requirement to underpin a search. As one noted observer has put it in a different constitutional context, “[t]he issue always is a comparison of the harm done by a marginal curtailment of one value with the benefit to another value from the curtailment.” R. Posner, How Judges Think, Harvard University Press 330 (2008). Here, the benefit obtained by allowing officers to act without a warrant in perceived emergency situations must trump the marginal curtailment of the warrant requirement. This case does not present a new exception, nor does it diminish the respect for the sanctity of the home. Rather, it simply adheres to the holding of our supreme court in Riggs, and applies a recognized exception to the warrant requirement.
AFFIRMED.
GRIFFIN, SAWAYA, PALMER, TORPY and JACOBUS, JJ., concur.
*604 TORPY, J., concurs and concurs specially, with opinion in which LAWSON, J., concurs.
LAWSON, J., concurs in result and concurs specially.
ORFINGER, J., dissents, with opinion in which COHEN, J., concurs.
EVANDER, J., dissents, with opinion in which ORFINGER, J., concurs.
COHEN, J., dissents, with opinion in which ORFINGER, J., concurs.

. The deputy testified that he thought that he did not help the child open the garage door. He conceded, however, that he may have helped the child lift the door.

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).