77 So.3d 787 (2011)
D.O., a juvenile, Appellant,
v.
The STATE of Florida, Appellee.
No. 3D10-3001.
District Court of Appeal of Florida, Third District.
December 21, 2011.
Carlos J. Martinez, Public Defender, and Brian L. Ellison, Assistant Public Defender, for appellant.
Pamela Jo Bondi, Attorney General, and Keri T. Joseph, Assistant Attorney General, for appellee.
Before WELLS, C.J., and EMAS, J., and SCHWARTZ, Senior Judge.
WELLS, Chief Judge.
Affirmed. See E.P. v. State, 997 So.2d 1240 (Fla. 3d DCA 2008) (citing Jackson v. State, 791 P.2d 1023 (Alaska Ct.App.1990) ("in the case of transportation in a *788 police vehicle, however, or in the analogous circumstances here, the necessity of close proximity will itself provide the needed basis for a protective pat-down of the person"), In re Kelsey, 243 Wis.2d 422, 626 N.W.2d 777 (2001), and State v. Evans, 67 Ohio St.3d 405, 618 N.E.2d 162 (1993)).
EMAS, J. specially concurring.
I concur in affirming the trial court's order denying the motion to suppress, but write to explain my reasons for doing so.
The relevant facts are not in dispute: A patrol officer in a marked police car observed D.O. walking with a group of five other juveniles. It was a school day, during school hours, and the juveniles were not walking in the vicinity of a school, carrying any books or book bags, or wearing any clothing that would readily identify them as students.
The officer approached the group and began to question them about their age and why they were not in school. After determining that D.O. was sixteen years old and should have been in school, the officer prepared to take D.O. back to school (or to his home, if he was suspended from school). Before placing D.O. in the back of the patrol car, the officer conducted a pat-down search of D.O.'s outer clothing. The officer did not have D.O.'s consent to do so, and the officer acknowledged that he had no reasonable suspicion to believe that D.O. was armed. The officer testified that he conducted a pat-down search because it is department policy to pat down any person before placing them in a patrol car, for officer safety. Upon conducting the pat down, the officer felt a "bulge," which D.O. told the officer was a firearm. The officer retrieved the firearm and D.O. was charged with carrying a concealed firearm.
D.O. filed a motion to suppress, arguing that the existence of a departmental policy does not provide the necessary basis to justify a pat-down search of a juvenile who is being transported based on truancy, which is not a criminal offense. D.O. argues that, because the officer had no reasonable suspicion that D.O. was armed, the pat-down search violated D.O.'s Fourth Amendment rights, and the firearm must be suppressed.
The trial court denied the motion to suppress, and D.O. entered a plea reserving the right to appeal the denial of this dispositive motion.
Thus, the issue presented is this: upon lawfully taking a juvenile truant into custody pursuant to its duty under section 984.13, Florida Statutes, may a police officer conduct a limited pat-down search for weapons, even in the absence of reasonable suspicion to believe the juvenile is armed, before placing the juvenile in a police vehicle for the purpose of delivering the juvenile without unreasonable delay to the appropriate school system site?
In order to properly analyze this particular search, we must first review the relevant statutory scheme. Chapter 984 (entitled "Children and Families in Need of Services") creates a broad array of services available to children and families in need of services and imposes a variety of duties upon state agencies to achieve several important goals. This chapter includes providing services for child runaways, children locked out of their home, children beyond the control of their parents, and habitual truants. See § 984.03(9), (25), and (27), Fla. Stat. (2011).
Section 984.13 was created to authorize and obligate law enforcement officers to serve as the initial contact point for children who may be in need of these services. That section provides:

*789 (1) A child may be taken into custody[1]:
(a) By a law enforcement officer when the officer has reasonable grounds to believe that the child has run away from his or her parents, guardian, or other legal custodian.
(b) By a law enforcement officer when the officer has reasonable grounds to believe that the child is absent from school without authorization or is suspended or expelled and is not in the presence of his or her parent or legal guardian, for the purpose of delivering the child without unreasonable delay to the appropriate school system site. For the purpose of this paragraph, "school system site" includes, but is not limited to, a center approved by the superintendent of schools for the purpose of counseling students and referring them back to the school system or an approved alternative to a suspension or expulsion program. If a student is suspended or expelled from school without assignment to an alternative school placement, the law enforcement officer shall deliver the child to the parent or legal guardian, to a location determined by the parent or guardian, or to a designated truancy interdiction site until the parent or guardian can be located.
(c) Pursuant to an order of the circuit court based upon sworn testimony before or after a petition is filed under s. 984.15.
(d) By a law enforcement officer when the child voluntarily agrees to or requests services pursuant to this chapter or placement in a shelter.
(2) The person taking the child into custody shall:
(a) Release the child to a parent, guardian, legal custodian, or responsible adult relative or to a department-approved family-in-need-of-services and child-in-need-of-services provider if the person taking the child into custody has reasonable grounds to believe the child has run away from a parent, guardian, or legal custodian; is truant; or is beyond the control of the parent, guardian, or legal custodian; following such release, the person taking the child into custody shall make a full written report to the intake office of the department within 3 days; or
(b) Deliver the child to the department, stating the facts by reason of which the child was taken into custody and sufficient information to establish probable cause that the child is from a family in need of services.
(3) If the child is taken into custody by, or is delivered to, the department, the appropriate representative of the department shall review the facts and make such further inquiry as necessary to determine whether the child shall remain in custody or be released. Unless shelter is required as provided in s. 984.14(1), the department shall:
(a) Release the child to his or her parent, guardian, or legal custodian, to a responsible adult relative, to a responsible adult approved by the department, or to a department-approved family-in-need-of-services and child-in-need-of-services provider; or
(b) Authorize temporary services and treatment that would allow the child alleged to be from a family in need of services to remain at home.
§ 984.13 Fla. Stat. (2011).
A reading of the entire section places into proper context the purpose and intent *790 of this statutory provision, as well as the role of law enforcement officers in carrying out its mandates. As can be seen, law enforcement's role is not to investigate criminal activity or apprehend suspects. Rather, it is to promote the safety and protection of children and families in need of services, and to ensure that individuals in need are provided with these services as expeditiously as possible. The Florida Legislature expressed this intent in section 984.02(1), Florida Statutes:
(1) GENERAL PROTECTIONS FOR CHILDREN.
It is a purpose of the Legislature that the children of this state be provided with the following protections:
(a) Protection from abuse, neglect, and exploitation.
(b) A permanent and stable home.
(c) A safe and nurturing environment which will preserve a sense of personal dignity and integrity.
(d) Adequate nutrition, shelter, and clothing.
(e) Effective treatment to address physical, social, and emotional needs, regardless of geographical location.
(f) Equal opportunity and access to quality and effective education which will meet the individual needs of each child, and to recreation and other community resources to develop individual abilities.
(g) Access to preventive services.
(h) An independent, trained advocate when intervention is necessary and a skilled guardian or caretaker in a safe environment when alternative placement is necessary.
Law enforcement officers serve as the eyes and ears of our community and are often the first to encounter individuals in the very situations addressed in Chapter 984. Law enforcement, in a very real sense, fulfills a role as a "community caretaker" when they encounter truants, child runaways, children locked out of their home, and children beyond the control of their parents. They have not only the authority, but also a statutory obligation, to quickly reunite the child with their parent or guardian, or return the child to school or the appropriate agency that can provide the services needed in light of the individual circumstances.
The United States Supreme Court first recognized the community caretaker doctrine in Cady v. Dombrowski, 413 U.S. 433, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973). In Cady, police officers found an unoccupied and disabled car that had been involved in an accident and left on the highway, posing a potential traffic hazard. The officers learned that the person who had been driving the vehicle was a police officer, that the officer was intoxicated and that his service revolver was still in the vehicle. Following a standard police procedure, and in order "to protect the public from the possibility that a revolver would fall into untrained or perhaps malicious hands," the officers searched the trunk of the vehicle for the gun. Id. at 443, 93 S.Ct. 2523. During the search of the trunk, the officers found evidence of an unrelated homicide. In holding the search valid, the Court noted the various roles served by state and local law enforcement:
Because of the extensive regulation of motor vehicles and traffic, and also because of the frequency with which a vehicle can become disabled or involved in an accident on public highways, the extent of police-citizen contact involving automobiles will be substantially greater than police-citizen contact in a home or office. Some such contacts will occur because the officer may believe the operator has violated a criminal statute, but many more will not be of that nature. *791 Local police officers ... frequently investigate vehicle accidents in which there is no claim of criminal liability and engage in what, for want of a better term, may be described as community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.

Id. at 441, 93 S.Ct. 2523 (emphasis added).
The community caretaker doctrine has been followed in Florida. See e.g., Ortiz v. State, 24 So.3d 596 (Fla. 5th DCA 2009) (observing that "[c]aretaking functions are performed by police officers because we expect them to take those steps that are necessary to `ensure the safety and welfare of the citizenry at large'" (quoting 3 LaFave, Search & Seizure (4th ed.2004), § 5.4(c), pp. 201-02)). See also Cobb v. State, 378 So.2d 82 (Fla. 3d DCA 1979); Shively v. State, 61 So.3d 484 (Fla. 2d DCA 2011); and Castella v. State, 959 So.2d 1285 (Fla. 4th DCA 2007). Cf. Riggs v. State, 918 So.2d 274, 280 n. 1 (Fla.2005) (acknowledging the doctrine but declining to consider its application to a search within a home based upon Cady's observance of a "constitutional difference between searches of and seizures from houses and similar structures and from vehicles").
It is within this framework, and in consideration of these circumstances, that we must determine the "reasonableness" of the officer's conduct in patting down the juvenile truant before transporting him, by police car, back to his school.
We first must note, of course, that truancy is not a crime, but rather an acknowledgment of compulsory education laws designed to ensure children under a certain age are in school. See § 1003.26-.27, Fla. Stat. (2011). See also L.C. v. State, 23 So.3d 1215 (Fla. 3d DCA 2009). But while truancy is not a criminal offense, the public relies in large part upon police officers on the street to enforce our truancy laws. Section 984.13(1)(b) authorizes a police officer to take into custody a child whom (s)he has reasonable grounds to believe is absent from school without permission. The statute further provides that the police officer shall "without unreasonable delay," deliver the child to the appropriate school system site or, if the child currently is suspended from school, to the child's parent or legal guardian or a designated truancy interdiction site until the parent or legal guardian is located. A police officer not only has the authority, but also the legal obligation, to take the juvenile into "custody" (although not the type of custody associated with an arrest for a criminal offense) and to transport the juvenile to school, home, or to his parent without unreasonable delay. See K.A.C. v. State, 707 So.2d 1175, 1177 (Fla. 3d DCA 1998) (observing that the juvenile was stopped by police "because of the possibility that he was truant, in which case the officers had a legal duty to transport him to school").
Labeling the encounter in this case as a "stop and frisk,"[2] is incomplete and somewhat misleading, given the unique character of truancy enforcement. The Court in Terry approved a limited pat-down search for weapons where a law enforcement officer lawfully and temporarily has detained an individual to investigate criminal activity, and has reasonable suspicion to believe that individual may be armed. By contrast, we are confronted here with a police officer who has probable cause to believe the juvenile is truant, but has neither probable cause to believe the juvenile committed *792 any crime, nor reasonable suspicion to believe the juvenile is armed. More to the point, in a typical Terry stop, the officer is merely conducting a temporary investigatory detention on the street. The encounter in our case has moved from the street to the police vehicle where the juvenile will be seated behind, and in close proximity to, the officer. This is a significant distinction when assessing the reasonableness of the officer's actions in light of the circumstances facing him. In United States v. Robinson, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973), the United States Supreme Court upheld, against a Fourth Amendment challenge, an officer's search of an individual incident to a lawful arrest. The Court cited two historical rationales for upholding the reasonableness of such a search: 1) the need to discover weapons on the arrestee and disarm him before transporting the arrestee to the police station; and 2) the need to discover contraband or evidence of the crime for which he has been placed under arrest. Id. at 234, 94 S.Ct. 467.
Notwithstanding the fact that D.O. had not committed a crime and was not being placed under arrest, he nonetheless was being taken into custody and being transported by the officer in a police vehicle. Therefore the first rationale for justifying searches incident to arrestofficer safetyis fully applicable to our case. While one may presume it more likely that such an attack would be committed by a criminal suspect than a juvenile truant, officer safety is still a significant and weighty concern in both scenarios.[3]
The encounter in this case thus defies classification as either a 1) search incident to arrest pursuant to a full custodial arrest or 2) a pat-down search pursuant to a valid temporary detention and reasonable suspicion that the person is armed; rather, the encounter is a hybrid bearing certain characteristics and underpinnings of each. We see this by having considered the "seizure" (full custody but not a criminal arrest) separately from the "search" (limited patdown).
Our analysis nevertheless must be guided by the same general principles espoused in Terry:
[W]e deal here with an entire rubric of police conductnecessarily swift action predicated upon the on-the-spot observations of the officer on the beatwhich historically has not been and as a practical matter could not be, subjected to the warrant procedure. Instead, the conduct involved in this case must be tested by the Fourth Amendment's general proscription against unreasonable searches and seizure.
....
In order to assess the reasonableness of [the officer's] conduct as a general proposition, it is necessary "first to focus upon the governmental interest which allegedly justifies official intrusion upon the constitutionally protected interests of the private citizen," for there is "no ready test for determining reasonableness other than by balancing the need to search (or seize) against the invasion which the search (or seizure) entails." Camara v. Municipal Court, 387 U.S. 523, 534-535, 536-537, 87 S.Ct. 1727, 1735, 18 L.Ed.2d 930 (1967).
Terry, 392 U.S. at 20-21.
The Court elaborated on these principles in Pennsylvania v. Mimms, 434 U.S. 106, *793 108-09, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977):
The touchstone of our analysis under the Fourth Amendment is always "the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security." Terry v. Ohio, 392 U.S. 1, 19, 88 S.Ct. 1868, 1878, 20 L.Ed.2d 889 (1968). Reasonableness, of course, depends "on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers." United States v. Brignoni-Ponce, 422 U.S. 873, 878, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975).
Thus we apply a balancing test, considering and weighing the public interests and individual rights at stake.

Public Interests
1. Law enforcement officers have been specifically designated by statute as the individuals obligated to carry out the important governmental function of ensuring compliance with our truancy laws and delivering juveniles to their school or their parent when the juvenile is absent from school without authorization. Because of this statutory duty,[4] officers do not have the option of obtaining consent from the juvenile to conduct a pat-down and, in the absence of such consent, leaving the juvenile where they found him.[5] Stated another way, if we require some level of articulable suspicion before permitting a pat down of a truant who is in the lawful custody of law enforcement, an officer will be forced to choose between his own personal safety and fulfilling his role as a community caretaker under Chapter 984.[6]
2. Law enforcement must carry out this duty "without unreasonable delay" so as to minimize the amount of time a child is absent from school. If we prohibit law enforcement from conducting a pat down of a juvenile truant before he is placed in a patrol car, additional delay likely will be caused by the need to call another officer (or second patrol car) to the scene to ensure officer safety during the transportation process.
3. Arguably the most significant governmental interest is officer safety, which the United States Supreme Court has characterized as "both legitimate and weighty." Maryland v. Wilson, 519 U.S. 408, 412, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997) (quoting Pennsylvania v. Mimms, 434 U.S. 106, 110, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977)). I do not think it unreasonable for a police officer to pat down an individual when the officer is duty-bound to transport the individual in his police vehicle. Out on the street, the police officer is in *794 control of the encounter and able to defend himself against an individual who may be armed. Once in a police car, however, this relative control over the individual diminishes or evaporates altogether. The officer's back is to the individual, and the officer's full attention is on the road. Under these circumstances, the officer has exposed himself to a significantly increased risk of harm from a person with access to a weapon.[7]
4. In many circumstances, the police officer will be transporting a juvenile back to a school campus. There is a strong governmental interest in ensuring that our school campuses and classrooms are weapons-free environments, and that our schoolchildren are safe (and feel safe) while at school. Permitting a limited pat-down search of juvenile truants would further that interest.

Individual Rights
1. Balanced against the public interest is the invasion of personal security that accompanies a pat-down search. Such a search has been described as a "serious intrusion upon the sanctity of the person, which may inflict great indignity and arouse strong resentment, and it is not to be undertaken lightly." See Terry, 392 U.S. at 17, 88 S.Ct. 1868. Some may contend that Terry's description no longer represents the general modern view. Terry was decided more than forty years ago, before such police-citizen encounters were captured routinely on video and made easily accessible on the internet, and perhaps the proliferation of such videotaped encounters has desensitized the general public to the indignity of such encounters. Even if this may accurately describe an evolving view of the general public, one cannot ignore or even lightly regard the individual embarrassment, indignity and stigma that is caused to the person subjected to such a search, typically held on the street, for any curious onlooker to see.[8]
2. Moreover, a pat-down search is undoubtedly more intrusive, frightening and embarrassing where the subject of the search is a juvenile as opposed to an adult.
3. Authorizing a pat-down search of juvenile truants without reasonable suspicion to believe the juvenile is armed may lend itself to abusive or pretextual practices by police.[9]
4. Establishing a bright-line rule permitting such pat-down searches may result in searches of even elementary-school truants. However, I do not intend that a pat-down search be required in every instance, but merely that police officers be authorized, in their discretion, to conduct a limited weapons search under these particular circumstances.
Weighing the governmental interests against the individual rights, I believe the balance should be struck in favor of permitting the search conducted in this case. *795 In recognition of the individual interests, and to minimize its intrusiveness, the search must be limited in scope to a pat-down of the outer clothing of the juvenile, and limited in purpose to locating any weapons on the juvenile's person.
Mention must be made of two decisions of this Court which have, to some extent, addressed the issue at bar. In E.P. v. State, 997 So.2d 1240 (Fla. 3d DCA 2008), we upheld, without further analysis, a pat-down search of a juvenile which "followed a Terry stop justified under section 984.13, Florida Statutes ... and justifiably preceded placing him in the police car for the purpose of taking him to school as the statute requires." Id.
In L.C. v. State, 23 So.3d 1215 (Fla. 3d DCA 2009), we reversed the denial of a motion to suppress where the police officer, instead of conducting a limited pat-down search for weapons, performed a direct search of all L.C.'s pockets. Holding that such a search was unreasonable under the Fourth Amendment, we expressly "save[d] for another day the not inconsequential question whether [the officer] would have had the authority to perform a pat-down search of L.C." Id. at 1220.
I believe that day has come, and we should plainly and explicitly hold that, upon lawfully taking a juvenile truant into custody pursuant to its duty under section 984.13, a police officer may conduct a limited pat-down search for weapons, even in the absence of reasonable suspicion to believe the juvenile is armed, before placing the juvenile in a police vehicle for the purpose of delivering the juvenile without unreasonable delay to the appropriate school system site.
NOTES
[1] The phrase "taken into custody" means "the status of a child immediately when temporary physical control over the child is attained by a person authorized by law, pending the child's release, detention, placement, or other disposition authorized by law." § 984.03(53), Fla. Stat. (2011).
[2] See Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); § 901.151, Fla. Stat. (2011)
[3] In recognizing these differences and striking a balance between the interests at stake, I conclude, infra, that a reasonable search under the circumstances is not a full search incident to arrest, but a less intrusive protective search limited in scope to a pat-down of the outer clothing of the individual and limited in purpose to discovering weapons on his person.
[4] See K.A.C. v. State, 707 So.2d 1175 (Fla. 3d DCA 1998).
[5] Other jurisdictions that have declined to permit a pat-down search under similar circumstances have noted that the offer of a ride was gratuitous and law enforcement was under no legal duty to transport the individual. See e.g., People v. Scott, 16 Cal.3d 242, 128 Cal.Rptr. 39, 546 P.2d 327 (1976). Cf. People v. Tobin, 219 Cal.App.3d 634, 638-39, 269 Cal.Rptr. 81 (1990) (upholding a pre-transport pat-down search where officer had a duty to remove the individuals from a position which was undeniably dangerous to themselves and to other members of the public).
[6] Counsel for D.O. agreed at oral argument that the "alternative" of handcuffing a juvenile truant before placing him in the police vehicle would be more intrusive than a limited pat-down search for weapons. See Reynolds v. State, 592 So.2d 1082, 1088 (Fla.1992) (Barkett, J., concurring in part and dissenting in part) (observing "handcuffing substantially aggravates the intrusiveness of an otherwise routine investigatory detention and is not part of a typical Terry stop" (quoting United States v. Bautista, 684 F.2d 1286, 1289 (9th Cir.1982))).
[7] Courts in several other states have held that the need to transport a non-arrestee in a police vehicle justifies a limited pat-down search for weapons, even in the absence of a reasonable suspicion to believe the individual is armed. See e.g., People v. Queen, 369 Ill. App.3d 211, 307 Ill.Dec. 400, 859 N.E.2d 1077 (2006); People v. Tobin, 219 Cal.App.3d 634, 269 Cal.Rptr. 81 (Cal.App.1990); Michigan v. Otto, 91 Mich.App. 444, 284 N.W.2d 273 (1979); State v. Lombardi, 727 A.2d 670 (R.I.1999).
[8] In fact, one might argue that the existence of easy access to these virtual encounters cause greater indignity and embarrassment to the individual whose experience with the police can be seen not only by a limited number of curious onlookers but also by an unlimited number of curious onliners as well.
[9] I do not address whether such a limited pat-down search is reasonable under the Fourth Amendment where the officer is under no duty to transport the individual.